UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

        Plaintiff,

  vs.                            REPORT AND RECOMMENDATION

Bruce Wilson Dow, Sr.,

        Defendant.         Crim. No. 10-065 (MJD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure.  A Hearing on the Motion was conducted on May, 25, 2010, at which time, the Defendant appeared personally, and by Caroline Durham, and the Government appeared by Erika R. Mozangue, Assistant United States Attorney.  For reasons which follow, we recommend that the Defendant's Motion to Suppress be denied.[1]

---

[1]The parties made their summations on the Record, at the time of the Hearing,
(continued...)

## II. Factual Background

The Defendant has been charged with one Count of Involuntary Manslaughter, in violation of Title 18 U.S.C. §§1112(a), 1151, and 1153(a). The events which gave rise to the pending charges are alleged to have occurred on or about October 10, 2009, within the exterior boundaries of the Red Lake Indian Reservation, which is located within this State and District. As pertinent to those charges, and to the Motion now before us, the operative facts may be briefly summarized.[2]

At the Hearing, the Defendant advised that his Motion to Suppress was directed at a blood sample which was taken from his person shortly after the incident that led to the present charges against him. The Government adduced the testimony of

---

[1](...continued)
and accordingly, the Court took the matter under advisement on May 25, 2010. See, Title 18 U.S.C. §3161(h) (1)(D) and (H); Henderson v. United States, 746 F.2d 619, 622 (9th Cir. 1984), aff'd, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 676-77 (8th Cir. 1995).

[2]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 US 1228 (1992); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

Kendall R. Kingbird, Sr. ("Kingbird"), who is a Sergeant with the Red Lake Indian Reservation Police Department ("RLPD"). Kingbird has worked as a Road Patrol Sergeant for the RLPD since 2005, and prior to that, he has worked in law enforcement since 1996. In his position as Road Patrol Sergeant, Kingbird is responsible for overseeing the Officers who serve underneath him. Kingbird further averred that he is required to interact with many different people, on a daily basis, and as a result, writing accurate police reports is important to being able to recollect past events. Kingbird attested that his job requires him to investigate, and to prepare reports, which he then submits to his supervisor.

Kingbird testified that, on October 10, 2009, while he was on-duty, he responded to a report of a rollover accident that had occurred in the Ponemah area of the Red Lake Indian Reservation, at approximately 8:54 o'clock p.m. It had been reported that only one (1) vehicle was involved in the accident, and that there were two (2) people in the vehicle. According to Kingbird, it took him approximately twenty (20) minutes to reach the scene of the accident.

Upon arriving at the scene, Kingbird observed that the ground around the vehicle was damaged, and that there were beer cans, bottles, and other debris, lying in the area. Kingbird also interviewed witnesses, and took photographs, while at the

scene. According to Kingbird, he did not interact with the Defendant at that time because, when he arrived, paramedics were already placing the Defendant, who was complaining of back pain, on a stretcher, in order to be transported for medical treatment. Kingbird also testified that he had no contact with Dale English ("English"), who was the other passenger in the vehicle, and who reportedly died as a result of the injuries sustained in the accident.

According to Kingbird, he then went to the Red Lake Hospital (the "Hospital"), where the paramedics informed him that they had found the Defendant in the driver's seat upon arriving at the accident scene. Kingbird related that he first made contact with the Defendant in a patient room within the Emergency Room, following the Defendant's treatment. Kingbird stated that the Defendant was able to carry on, and have a conversation with him, although he had the odor of alcohol on his breath. According to Kingbird, the Defendant was not placed under arrest at any time during, or after, their interaction. He asked the Defendant if he was willing to talk about the accident, and the Defendant agreed. Kingbird further averred that, during their conversation, the Defendant was coherent, and Kingbird had no difficulty in understanding the Defendant.

Kingbird testified that he spoke with the Defendant for approximately five (5) minutes prior to the blood draw. As recounted by Kingbird, during that interview, he advised the Defendant that he was going to take a blood sample, and the Defendant said that was "alright." Kingbird averred that he did not order the Defendant to consent to the blood draw, although he did not explicitly tell him that he could refuse to consent, or that the sample was for law enforcement purposes. Kingbird testified that the Defendant could have refused, at which time, Kingbird would have proceeded to obtain a Search Warrant. Kingbird stated that Agent Mertz, of the Federal Bureau of Investigation ("FBI"), and Charlotte Arlene Iceman ("Charlotte"), were present when Kingbird advised the Defendant about the blood draw.[3] According to Kingbird, it is standard procedure to get a blood sample when it is believed that alcohol is involved in a traffic accident. Kingbird further testified that hospital staff performed the blood draw, and that the Defendant was cooperative, and did not voice any objection before, during, or after, his blood was drawn.

---

[3]Kingbird testified that, in his Report, which he drafted shortly after his investigation on October 10, 2009, he stated that two (2) other people were present when he questioned the Defendant -- namely, Agent Mertz and someone named "Charlotte Clark." The Defendant later called Charlotte Arlene Iceman to the stand, who testified that she was present during the interview of the Defendant, but it is unclear to us why she was given that surname in his Report. Nevertheless, we understand Kingbird to have been referring to Charlotte Arlene Iceman.

Kingbird testified that, on the night of the accident, he worked from approximately 6:00 o'clock p.m., on October 10, 2009, until approximately 6:00 o'clock a.m., the following morning, and that he wrote his Report, which described his investigation of the accident, prior to going home that morning. Kingbird acknowledged that he had reported that he had questioned the Defendant, and that he had also described questions and comments that were made by Mertz, and Charlotte, during the interview. Kingbird further testified that he had acknowledged, in his Report, that a blood draw was conducted, but that he had not specifically described talking to the Defendant about the blood draw, or obtaining the Defendant's consent for the blood draw. Kingbird stated that, had the Defendant actually refused, he would have included that detail in his Report. Kingbird attested to the fact that he is familiar with the requirements for taking a blood draw for law enforcement purposes. Kingbird also related that he was contacted, on May 1, 2010, by FBI Special Agent Ball, who asked him to prepare a supplemental report regarding the Defendant's demeanor at the time of the blood draw.

At the time of the Hearing, the Defendant also called three (3) witnesses. First, the Defendant elicited the testimony of Chad Spahn ("Spahn"), who is an Investigator with the Office of the Federal Defender, and who had investigated matters involving

the Defendant's case. As related by Spahn, during his investigation, he went to the Red Lake Hospital and asked about their policies and procedures for conducting a blood draw for law enforcement purposes -- that is, blood draws that are not performed solely for medical purposes. In particular, Spahn spoke with Janice Meidinger ("Meidinger"), who is the supervisor of the laboratory at the Red Lake Hospital. Meidinger informed him that the Hospital has a standard form, which staff are required to utilize when performing a blood draw for law enforcement purposes. According to Spahn, Meidinger stated that, in the normal course of business, the form is to be completed prior to any such blood draw, and that the form is then placed in the patient's file. Meidinger did not advise that the form was optional.

The Defendant introduced as an Exhibit, a copy of the consent form, without objection from the Government, during the course of the Hearing. See, <u>Defendant's Exhibit 1</u>. The form provides as follows:

> **Legal Alcohol Draws**
>
> • Legal Alcohol levels are drawn by Laboratory staff upon request from law enforcement officers.
>
> • A patient consent form must be completed prior [sic] draw.
>
> • A copy of the consent form is retained in the laboratory as well as patient's chart.

- Lab will not run this test nor obtain results.

- This is strictly a courtesy draw for Law Enforcement.

Id.

In the bottom right-hand corner of the document there is a section entitled "Consent to Draw Blood Sample," which provides as follows:

> I, _____, hereby authorize the Red Lake Indian Health Services Hospital to obtain a sample of my blood for [sic] purpose of determining my blood alcohol content. This permission is given by me voluntarily and without threats or promises of any kind being made to me.

Id.

Spahn averred that he reviewed the Defendant's medical records, which did not contain a completed consent form. Spahn did not know if the Hospital recognized exceptions to the use of the form, and he did not speak with the person who drew the Defendant's blood.

The Defendant next called Charlotte, who is the Defendant's niece. Charlotte testified that she was on her way to Bemidji, Minnesota, when she learned that the Defendant had been involved in a car accident, and that he had been taken to the Hospital. According to Charlotte, she arrived at the Hospital, in order to see the Defendant, some time after 10:30 o'clock p.m., and she stayed with him while he was being treated.

Charlotte recounted that she was present when Kingbird questioned the Defendant. According to Charlotte, following the completion of the Defendant's medical treatment, and discharge, a nurse told them that they should wait for law enforcement to return to interview the Defendant. Charlotte recalled waiting for more than one (1) hour before law enforcement arrived, and that, during the interview, law enforcement asked the Defendant how the accident happened, and how fast he was going, at the time of the accident. Charlotte did not recall anyone asking the Defendant if they could perform a blood draw, and she did not recall any hospital staff returning to obtain the Defendant's blood sample, after law enforcement left. According to Charlotte, she and the Defendant left right after law enforcement ended their interview of the Defendant.

After reviewing Kingbird's report, Charlotte recalled telling the Defendant not to say that he killed English because it was an accident. Charlotte testified that she understood that the Defendant was being charged with a Federal offense, and she admitted that she did not want the Defendant to get in trouble, or go to jail, and that she was afraid law that law enforcement would take the Defendant to jail. However, she said that she would not lie to keep him out of trouble, and that she was telling the

truth.  Charlotte further testified that, while she was waiting with the Defendant, she was trying to clean blood from a wound on the Defendant's arm.

Next, the Defendant called Darren J. Iceman, Jr. ("Darren"), who is Charlotte's husband.  Darren testified that, on October 10, 2009, he went to the Hospital with Charlotte after they were notified of the car accident.  Darren stated that, after staying in the Defendant's room for a short period of time, he went outside to wait in the car, because it was too hot inside.  Darren testified that, while he was inside the Defendant's Hospital room, he did not recall any law enforcement officers arriving to speak with the Defendant.  However, Darren did recall that a hospital staff person came in to attempt to draw the Defendant's blood, although that attempt was unsuccessful.

As a rebuttal witness, the Government called Kingbird for a second time, at which time, he testified regarding his knowledge of the consent form, which was introduced into evidence by the Defendant.[4]  See, <u>Defendant's Exhibit 1</u>.  Kingbird

---

[4]Before the taking of any testimony, counsel for the Government requested that all testifying, nonparty witnesses, be sequestered and, without objection from the Defendant, the sequestration request was granted.  Following Kingbird's questioning, he was sequestered, again, from the Hearing, but counsel for the Government advised that she was not dismissing Kingbird as he might be needed for rebuttal testimony.  At the time that the Government recalled Kingbird for rebuttal purposes, the
(continued...)

testified that he had never seen, nor utilized, the consent form, although he had requested blood draws on several prior occasions. Kingbird further testified that the nurse who drew the blood voiced no objection to complying with his request.

## III. Discussion

A.    The Defendant's Motion to Suppress Evidence.

1.    Standard of Review. There can be no serious question that the taking of a blood sample, so as to determine its alcohol content, is subject to the proscriptions of the Fourth Amendment. As the Supreme Court explained, in Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 616 (1989):

---

[4](...continued)
Defendant objected on the grounds that Kingbird might be questioned on the Defendant's Exhibit 1, which he could only know about by disclosures from the Government's attorney.

We denied the Motion to exclude Kingbird's rebuttal testimony as, in our view, the purpose of sequestering witnesses is twofold: "It exercises a restraint on witnesses "tailoring" their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid." Geders v. United States, 425 U.S. 80, 87 (1976), citing 6 J. Wigmore, Evidence Section 1838. Here, counsel for the Defendant had an opportunity to question Kingbird on whether he had been coached in his testimony by counsel for the Government, and no such showing was made as no such questioning occurred. See, e.g., United States v. Comacho, 555 F.3d 695, 702 (8th Cir. 2009). Moreover, counsel for the Government represented to the Court that she had not coached Kingbird, but had simply shown him Defendant's Exhibit 1.

Our precedents teach that where, as here, the Government seeks to obtain physical evidence from a person, the Fourth Amendment may be relevant at several levels. See, e.g., United States v. Dionisio, [410 U.S. 1, 8 (1973)]. The initial detention necessary to procure the evidence may be a seizure of the person, Cupp v. Murphy, [412 U.S. 291, 294-295, (1973)]; Davis v. Mississippi, [394 U.S. 721, 726-727 (1969)], if the detention amounts to a meaningful interference with his freedom of movement. INS v. Delgado, [466 U.S. 210, 215 (1984)]; United States v. Jacobsen, [466 U.S. 109, 113, n. 5 (1984)]. Obtaining and examining the evidence may also be a search, see Cupp v. Murphy, supra [at 295], United States v. Dionisio, supra [at 8], if doing so infringes an expectation of privacy that society is prepared to recognize as reasonable, see, e.g., California v. Greenwood, [486 U.S. 35, 43 (1988)]; United States v. Jacobsen, supra [at 113].

We have long recognized that a "compelled intrusio[n] into the body for blood to be analyzed for alcohol content" must be deemed a Fourth Amendment search. See Schmerber v. California, [384 U.S. 757, 767-768 (1966)]. See also Winston v. Lee, [470 U.S. 753, 760 (1985)]. In light of our society's concern for the security of one's person, see, e.g., Terry v. Ohio, [392 U.S. 1, 9 (1968)], it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable.

"The Constitution only protects against 'intrusions that are not justified in the circumstances, or which are made in an improper manner.'" Kruger v. Erickson, 875 F. Supp. 583, 588 (D. Minn. 1995), aff'd, 77 F.3d 1071 (8th Cir. 1996), quoting Schmerber v. California, 384 U.S. 757, 768 (1966).

"Courts must consider 'whether [officials] were justified in requiring [the defendant] to submit to the test, [and] whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness.'" Id., quoting Schmerber v. California, supra at 768. In determining the reasonableness of a search, "we look to a balancing of 'the need to search against the invasion which the search entails.'" McDonell v. Hunter, 809 F.2d 1302, 1307 (8th Cir. 1987), quoting, in turn, Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 537 (1967). Courts have recognized the reasonableness of drawing blood samples from suspects. See, United States v. Long Feather, 299 F.3d 915, 919 (8th Cir. 2002)("A defendant can be compelled [] to give a blood sample."), citing Schmerber v. California, supra at 757.

Regardless of the reasonableness of any search, "[s]earch warrants are ordinarily required for searches of dwellings, and absent an emergency, no less could be required where intrusions into the human body are concerned." Schmerber v. California, supra at 770. Warrantless searches and seizures are constitutional only if supported by a showing of probable cause, and exigent circumstances. See, Kirk v. Louisiana, 536 U.S. 635, 638 (2002)(noting that "police officers need either a warrant or probable cause plus exigent circumstances."); Welsh v. Wisconsin, 466 U.S. 740,

749 (1984); <u>Payton v. New York</u>, 445 U.S. 573 (1980); <u>United States v. Walsh</u>, 299 F.3d 729, 733 (8th Cir. 2002)("'A warrantless search is reasonable when justified by both probable cause and exigent circumstances.'"), cert. denied, 537 U.S. 1066 (2002), quoting <u>United States v. Parris</u>, 17 F.3d 227, 229 (8th Cir. 1994), cert. denied, 511 U.S. 1077 (1994)); <u>Berglund v. City of Maplewood</u>, 173 F. Supp.2d 935, 943 (D. Minn. 2001)(explaining that "there is no need to obtain a warrant if (1) there is probable cause and (2) there are exigent circumstances requiring immediate action."), aff'd, 50 Fed. Appx. 805 (8th Cir., November 21, 2002), cert. denied, 539 U.S. 965 (2003).

The United States Supreme Court has instructed that "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." <u>Welsh v. Wisconsin</u>, supra at 749-50. However, the Court has recognized a small number of such exigent circumstances: "Hot pursuit" of a fleeing felon, see, <u>United States v. Santana</u>, 427 U.S. 38, 42-43 (1976), a risk of destruction of evidence, see, <u>Schmerber v. California</u>, supra at 770-71, and threats of violence or danger to human life, see, <u>Welsh v. Wisconsin</u>, supra at 748; <u>United States v. Ball</u>, 90 F.3d 260, 263 (8th Cir. 1996).

Nevertheless, "'[a]n officer with consent needs neither a warrant nor probable cause to conduct a constitutional search.'" United States v. Pennington, 287 F.3d 739, 746 (8th Cir. 2002), cert. denied, 537 U.S. 1022 (2002), quoting United States v. Jenkins, 92 F.3d 430, 436 (6th Cir. 1996), cert. denied, 520 U.S. 1170 (1997). "Whether or not the consent was voluntary must be established by examining the totality of the circumstances, including 'both the characteristics of the accused and the details of the interrogation.'" United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000), quoting United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990), quoting, in turn, Schneckoth v. Bustamonte, supra at 226. "We consider the following characteristics of the individual to determine whether their [sic] consent was truly voluntary: age, intelligence, intoxication, advice of Miranda rights, and previous arrests." United States v. Reinholz, 245 F.3d 765, 780 (8th Cir. 2001), cert. denied, 534 U.S. 896 (2001), citing United States v. Chaidez, supra at 381; see also, United States v. Urbina, 431 F.3d 305, 309 (8th Cir. 2005); United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001), cert. denied, 535 U.S. 964 (2002).

In addition to the characteristics of the defendant, "[w]e also consider the following characteristics of the environment in which the individual's consent was given, so as to determine whether their [sic] consent was truly voluntary:  length of

detention, threats and misrepresentations by police, whether the individual is in custody or under arrest, whether it is a public or private place, and the suspect's contemporaneous objections and representations." United States v. Reinholz, supra at 780; see also, United States v. Va Lerie, 424 F.3d 694, 709 (8th Cir. 2005), cert. denied, 548 U.S. 903 (2006); United States v. Mendoza-Cepeda, 250 F.3d 626, 629 (8th Cir. 2001)(listing factors to be considered as to voluntariness of consent to search); United States v. Chaidez, supra at 381("These factors should not be applied mechanically * * * [but] [rather] are valuable as a guide to analysis.")[citations omitted].  Moreover, in determining whether an individual has expressed consent, "[t]he precise question is not whether [the accused] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented." United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001), citing United States v. Sanchez, 32 F.3d 1330, 1333-35 (8th Cir. 1994), cert. denied, 513 U.S. 1158 (1995). "Consent can be inferred from words, gestures, and other conduct." Id., citing United States v. Mendoza-Cepeda, supra at 627.

Ultimately, "[c]onsent is voluntary if it was 'the product of an essentially free and unconstrained choice by its maker,' * * * rather than 'the product of duress or coercion, express or implied.'" United States v. Bradley, supra at 366, quoting United

States v. Chaidez, supra at 380, quoting, in turn, Schneckloth v. Bustamonte, supra at 225, 227.  "[T]he question whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of all circumstances."  Schneckloth v. Bustamonte, supra at 227; see also, United States v. Fleck, 413 F.3d 883, 891-92 (8th Cir. 2005).  The Government has the burden to show, by a preponderance of the evidence, that a defendant's consent was voluntary.  See, United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005), citing United States v. Cedano-Medina, 366 F.3d 682, 684-85 (8th Cir. 2004), cert. denied, 543 U.S. 1035 (2004); United States v. White, 81 F.3d 775, 780 (8th Cir. 1996), cert. denied, 519 U.S. 1011 (1996).

2.	Legal Analysis.  The Defendant moves to suppress evidence of his blood sample, based upon his contention that it was a warrantless search, and that it was otherwise without his consent.  We find, however, that the Defendant voluntarily consented to provide a blood sample, and as a consequence, that the sample was not taken in violation of his Fourth Amendment rights.

Turning to the factors, which inform our analysis of consent, we note that the Defendant is a mature individual, who does not suggest, let alone competently support, that he has any difficulty in speaking and understanding English, or that his

intelligence rendered him incapable of providing consent.[5]  We recognize that the

Defendant did not receive a <u>Miranda</u> warning, and that he was not informed that he

had the right to refuse his consent.   However, it is well-established that, while

relevant, that factor does not, by itself, render consent involuntary.  See, e.g., <u>United

States v. Saenz</u>, 474 F.3d 1132, 1137 (8th Cir. 2007)("We have not required an officer

to provide Miranda warnings before requesting consent to search or held that an

absence of Miranda warnings would make an otherwise voluntary consent

involuntary."); <u>United States v. Va Lerie</u>, supra at 710 ("The Supreme 'Court has

rejected in specific terms the suggestion that police officers must always inform

citizens of their right to refuse when seeking permission to conduct a warrantless

consent search.'"), quoting <u>United States v. Drayton</u>, 536 U.S. 194, 206 (2002);

<u>United States v. Esquivias</u>, supra at 701 ("While the officers did not inform [the

defendant] of his right to refuse consent, a defendant need not be aware, nor must an

officer inform him, of his right to refuse consent for his consent to be voluntary."),

citing <u>United States v. Becker</u>, 333 F.3d 858, 861 (8th Cir. 2003); <u>United States v.

Alcantar</u>, supra at 737 ("Although [the defendant] was not advised of his right to

---

[5]The Record does not indicate whether the Defendant has had any past
experience with the criminal justice system, and accordingly, that factor of the
analysis has had no bearing on our analysis.

refuse consent, that was not in and of itself sufficient to find that consent was not voluntarily given."), citing United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999).

Of course, we are mindful that the Defendant may have been under the influence of alcohol, and that he had apparently suffered some injuries, during the accident, that had required medical attention. Nevertheless, the Defendant has not suggested, let alone competently established, that he was incapable of providing his consent, as a result of any intoxication, or any injuries he may have sustained. "[T]he mere fact that one has taken drugs, or is intoxicated, or mentally agitated, does not render consent involuntary." United States v. Rambo, 789 F.2d 1289, 1297 (8th Cir. 1986)[citations omitted]; see also, United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006), cert. denied, 549 U.S.1292 (2007); United States v. Gipp, 147 F.3d 680, 686 (8th Cir. 1998); United States v. Scheets, 188 F.3d 829, 839-40 (7th Cir. 1999)(finding that consent to search was voluntary despite apparent intoxication where there was no evidence in the Record that the defendant was not aware of what he was doing, or that he failed to appreciate the significance of his actions), cert. denied, 528 U.S. 1096 (2000). Here, as noted, we find that there is no evidence that any asserted intoxication, or the Defendant's medical condition, precluded him from consenting

to the blood sample, or rendered him incapable of appreciating the significance of his actions.

Moreover, it is undisputed that the Defendant was not under arrest, and we find no basis for otherwise concluding that the Defendant was in custody. The interaction between the Defendant, and law enforcement, was brief.[6] Moreover, there is no suggestion that the Defendant was threatened, physically intimidated, or punished, by law enforcement, or that anyone made any promises, or misrepresentations, to the Defendant, which would have impacted upon his giving his consent to a blood draw. See, e.g., United States v. Urbina, supra at 309 ("There is no evidence that the officer treated [the defendant] in anything other than a professional manner."); United States v. Thompson, 408 F.3d 994, 996 (8th Cir. 2005)("[T]he police officer treated [the defendant] in a polite and friendly manner.").

The context in which the consent was given further supports our finding that the Defendant's consent was voluntary. Here, Kingbird testified that the Defendant

---

[6]We understand, from Charlotte's testimony, that the Defendant had been directed to wait, by the medical personnel -- assertedly for about an hour -- in order to speak with law enforcement, but there is no evidence to suggest that law enforcement had required him, or even asked him to wait, and there is no intimation in this Record that either the Defendant, or Charlotte on his behalf, had complained to anyone about the wait. Accordingly, on this Record, the wait was also consensual.

stated that it was alright for law enforcement to take a blood sample. Most importantly, the Defendant voiced no objection to the blood draw before, during, or after, the blood sample was taken and, at no time, did he attempt to stop the hospital staff from performing the blood draw. Indeed, the evidence adduced at the Hearing established that the Defendant fully cooperated with his blood draw. See, United States v. Ramey, supra at 107-108 (affirming the District Court's finding that the defendant had consented to the blood draw where a doctor informed him that the police had requested a blood sample, and where testimony indicated that he had acquiesced to the request by holding out his arm and watching the technician clean his arm); cf., United States v. Chaidez, supra at 382 (finding that opening up the trunk for law enforcement supported the conclusion that the defendant voluntarily consented to the search, since "[t]his type of cooperation evinces voluntariness."); United States v. Esquivias, supra at 700 (one of the factors to consider is whether the defendant "stood silently by * * * as the search occurred."); United States v. Smith, 260 F.3d 922, 925 (8th Cir. 2001)(finding that, even if the defendant had not verbally consented, he had "at the very least * * * indicated his consent to the search by raising his hands."). We find that, by cooperating with hospital staff, the Defendant manifested his voluntary consent to the blood draw.

Lastly, we are mindful of the Defendant's contention that consent was never obtained, as evidenced by the absence of an executed consent form, and the testimony of Charlotte and Darren which, the Defendant contends, evinces that the blood sample was obtained prior to Kingbird's interview of the Defendant. Stated otherwise, we recognize that there is factual dispute as to whether Kingbird actually spoke with, and obtained the Defendant's consent, prior to directing the Hospital's staff to complete a blood draw, for law enforcement purposes. Based upon our review of the evidence, we find the Defendant's contention to be unsupported by the Record.

Kingbird testified that he had never seen, nor employed, the consent form on any of the previous occasions that he had obtained blood samples as a police officer, and that the form is not a utilized for law enforcement purposes. Rather, the evidence demonstrated that it is a form that is employed as a part of the Hospital's own procedures. While it would have been better had someone obtained the Defendant's written consent, the fact that a form had not been used in this instance, and therefore, had not been signed by the Defendant, does not, in our view, necessarily lead to the conclusion that consent was not obtained prior to the taking of the blood sample, nor do we find that the failure to utilize it was otherwise constitutionally significant.

With respect to the testimony of Darren and Charlotte, we are unable to conclude, as the Defendant contends, that their testimony establishes that law enforcement did not obtain consent prior to the blood draw. First, we note that Darren testified that he was only in the Hospital room for a short while and, as a consequence, we have found that his testimony provides little insight into the events that occurred that day. Moreover, their testimony concerning the events at the Hospital was not entirely convincing, in our view, since neither witness demonstrated that they were able to recall a clear account of the events at the Hospital, so as to properly impeach the testimony of Kingbird. Charlotte's testimony, in particular, was equivocal, as she did not recall a blood sample having been taken at any time, while Darren only recalled that the attempt to obtain the Defendant's blood sample, by medical personnel, was unsuccessful. Neither witness testified that the Defendant voiced, or demonstrated, any objection to the taking of a blood sample. Accordingly, we have found nothing in the testimony of either Darren, or Charlotte, to detract from the testimony of Kingbird, which established that consent was properly obtained, prior to the taking of the blood sample.[7]

_____

[7]Similarly, we do not overlook the Defendant's contention that Kingbird's testimony is suspect because his original report did not address the issue of the
(continued...)

In sum, we find that the Defendant voluntarily consented to provide a blood sample, and therefore, we recommend that the Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 22] be denied.


Dated:  June 11, 2010                     s/Raymond L. Erickson
                                                      Raymond L. Erickson
                                                      CHIEF U.S. MAGISTRATE JUDGE

---

[7](...continued)
Defendant's consent, which was only addressed in a later, supplemental report that he had been invited to write by the FBI.  We have weighed that factor in our credibility analysis, but do not regard Kingbird's original oversight as a significant detraction from the believability of his testimony.  In a better world, investigating officers would have reports that are without deficiencies but, when the officers are investigating a fatal automobile accident, and questioning witnesses at the scene, and later, at the Hospital, they may be subject to overlooking details, and even important details. Here, we found Kingbird's testimony to be credible notwithstanding the effective cross-examination of defense counsel.

**NOTICE**

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 25, 2010**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 25, 2010**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.